*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-0687


BRIAN E. MOORE, APPELLANT,

V.

UNITED STATES, APPELLEE.


Appeal from the Superior Court
of the District of Columbia
(2018-CF3-011411)

(Hon. Craig Iscoe, Motions Judge; Hon. Milton C. Lee, Jr., Trial Judge)

(Argued January 13, 2022                    Decided November 17, 2022)

*Sean R. Day* for appellant.

*Katherine M. Kelly*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney, and *Elizabeth Trosman* and *John P. Mannarino*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and EASTERLY, *Associate Judges*, and THOMPSON, *Senior Judge*.[*]

Opinion by *Senior Judge* THOMPSON, dissenting in part, at page 51.

---

[*] Judge Thompson was an Associate Judge of the court at the time of argument. She began her service as a Senior Judge on February 18, 2022.

EASTERLY, *Associate Judge*: Attorney John Harvey was appointed by the trial court to represent Brian Moore in a contempt proceeding after Mr. Moore allegedly violated an order prohibiting him from contacting his then-wife. But Mr. Harvey subsequently became a witness against Mr. Moore: Mr. Harvey was called by the United States government in a separate criminal case to testify about two private in-the-hallway-outside-the-courtroom mid-trial conversations during which Mr. Moore made hostile remarks about the District of Columbia Assistant Attorney General (AAG) who had been assigned to prosecute his contempt case. Based on Mr. Harvey's inculpatory testimony, Mr. Moore was sentenced to an aggregate of eight years in federal prison for threatening a public official and obstructing justice (two counts each).

Mr. Moore challenges his convictions on multiple grounds. We address only two: his argument that the evidence supporting his convictions was legally insufficient and his argument that the admission at his trial of Mr. Harvey's testimony violated Mr. Moore's evidentiary attorney-client privilege. Although we reject Mr. Moore's sufficiency claims, we hold, based on the record in this case, that the trial court erred in ruling that Mr. Harvey's conversations with Mr. Moore were not privileged and thus his testimony about these conversations was admissible

against Mr. Moore at trial. Further, because we conclude this erroneous evidentiary ruling was not harmless, we vacate Mr. Moore's convictions.

## I. Sufficiency

### A. Trial Facts and Procedural History

At Mr. Moore's May 2019 jury trial for threatening a public official and obstructing justice, the government called three witnesses: the District of Columbia AAG who had prosecuted Mr. Moore for contempt, a Deputy United States Marshal assigned to investigate the threats against the AAG, and Mr. Harvey. Because Mr. Harvey was the only witness who actually heard what Mr. Moore said, the government's case rested on his testimony.

Mr. Harvey, a longtime member of the Superior Court's Criminal Justice Act panel,[1] explained that he heard Mr. Moore's statements because he was Mr. Moore's court-appointed lawyer in the contempt case. Mr. Harvey testified that the

---

[1] *See Criminal Justice Act (CJA) Attorneys*, District of Columbia Courts, https://www.dccourts.gov/services/cja-practitioner; https://perma.cc/SUG6-DHLU (last visited Nov. 15, 2022).

statements in question were made on two occasions during Mr. Moore's 2018 contempt trial, which spanned several months so that Mr. Moore, who was not detained and lived in North Carolina, would not miss too many consecutive days of work. On both occasions, the statements were made after the AAG sought to alter Mr. Moore's conditions of release.

Prior to the first incident on April 12, 2018, the AAG asked the court to reverse its order discontinuing GPS monitoring of Mr. Moore via an ankle bracelet. Mr. Harvey and Mr. Moore met in the hallway outside the courtroom to discuss this development, or more particularly, Mr. Moore's feelings about this development. Mr. Moore was "very agitated" and began by saying things like "[f]uck that bitch. I hate this bitch," referring to the AAG. Responding to Mr. Moore, Mr. Harvey explained that the AAG was doing her job as a prosecutor, and it was "just silly on his part to be angry." This only further angered Mr. Moore, who not only repeated "fuck that bitch" but also added "I'll shoot that bitch." When Mr. Harvey said, "Man, what are you talking about?" Mr. Moore replied, "That's right, Harvey. I'll shoot that bitch." Mr. Harvey told Mr. Moore he was "starting to . . . think [Mr. Moore was] serious," prompting Mr. Moore to say, "God damn right, Harvey. Fuck that bitch. I'll shoot that bitch." Mr. Harvey then told Mr. Moore he would have to withdraw from representing him and left to call Bar Counsel.

Mr. Harvey testified that he called Bar Counsel to "find out what [his] options were." Mr. Harvey explained that he was aware that, within the scope of his representation of Mr. Moore on contempt charges, he could not disclose Mr. Moore's "secrets" about past criminal activity, but Mr. Harvey's understanding was that Mr. Moore's threats to commit future criminal activity fell outside that representation.[2] Mr. Harvey also noted that under Rule 1.6 of the District of Columbia's Rules of Professional Conduct, he was authorized to "reveal client confidences and secrets[] to the extent reasonably necessary . . . to prevent" a client from engaging in a criminal act that he as the attorney "reasonably believe[d] [wa]s likely to result in death or substantial bodily harm absent disclosure." *See* D.C. R. Prof. Conduct 1.6(c)(1). Mr. Harvey testified that Bar Counsel advised him that the decision whether to disclose such statements under this rule was left to his discretion.

Relying on a different rule, D.C. R. Prof. Conduct 1.16 (regarding declining or terminating representation), Mr. Harvey decided to ask the court if he could withdraw because of an unspecified "ethical problem." He did not indicate which

---

[2] Mr. Harvey explained to the jury, "If [a client] says, 'I'm going to shoot the President,' that means [they are] going to do something in the future. I cannot participate in that because, if I give [them] any legal advice, then, basically, I'm helping [them] and guiding [them] through the process to commit a crime as opposed to advising [them] about what the legal ramifications are because [they] committed one."

subsection of Rule 1.16 he wished to rely upon. When the judge asked if Mr. Harvey reasonably believed that Mr. Moore had used or was attempting to use his services to perpetrate a crime or a fraud, alluding to D.C. R. Prof. Conduct 1.16(b)(1) and (2), Mr. Harvey told the court he had "concerns." But Mr. Harvey later told the judge that his "reason for wishing to withdraw ha[d] nothing to do with [Mr. Moore] requesting [Mr. Harvey] to do anything." His relationship with Mr. Moore had become "toxic" by this point and Mr. Harvey just "wanted to get out of the case." The trial court refused to allow him to withdraw based on the information he provided. In the meantime, Mr. Moore informed Mr. Harvey that he had just been "bullshitting" and reassured him, "I didn't mean it. I didn't mean it."[3]

Mr. Harvey testified that he told Mr. Moore that he would continue to represent him but instructed him, "You will never, ever use this kind of language with me about anybody because, from this point forward, I'm going to believe you. So if you decide you want to go shoot somebody, you need to keep that to yourself and don't make me a part of it."[4] Mr. Moore responded: "All right, Harvey. I'm not

---

[3] According to the Deputy Marshal's notes from his interview of Mr. Harvey, Mr. Moore also apologized and told Mr. Harvey he was "just blowing off steam."

[4] Before the grand jury, Mr. Harvey additionally testified that he warned Mr. Moore that if Mr. Moore ever threatened the AAG again, he would tell the court. The transcript of Mr. Harvey's trial testimony on cross-examination is less clear

going—I won't say nothing like that again. I was just bullshitting." Mr. Harvey and Mr. Moore then entered the courtroom and the trial resumed.

Mr. Moore failed to appear at his next scheduled trial date in June 2018. Mr. Harvey explained to the court that Mr. Moore was training for a new job as a crane operator and had to attend a certain number of classes within a period of time. The judge continued the trial until June 29, 2018, and informed Mr. Harvey that if Mr. Moore did not appear on that date, she would issue a bench warrant for Mr. Moore's arrest. On June 29, a Friday, Mr. Moore returned to court and the AAG again asked the court to either detain him or order him to resume wearing an ankle bracelet. The court granted the AAG's request to put Mr. Moore back on GPS monitoring. Because it was nearing 5 p.m., it was too late for Mr. Moore to get an ankle bracelet that day; he had to return to the courthouse on Monday morning. Mr. Harvey testified that Mr. Moore was "pissed off" about this development because it meant that he would have to miss job training scheduled for Monday. Mr. Harvey successfully advised Mr. Moore to keep his anger in check while they were before the judge, but once they were out in the hallway, Mr. Moore expressed his feelings

---

about whether Mr. Harvey warned Mr. Moore only that he would withdraw, or if Mr. Harvey explicitly told Mr. Moore that he would tell the court what Mr. Moore said.

to Mr. Harvey. Mr. Harvey explained that Mr. Moore "wasn't hollering and screaming, but you could see [from] the expression on his face that he was . . . mad." According to Mr. Harvey, they had the following exchange:

| | |
|---|---|
| Mr. Moore: | [I]f I lose my job, I'm going to bust a cap in this bitch, I'm going to bust a cap in this bitch. |
| Mr. Harvey: | Man, what are you doing? |
| Mr. Moore: | Man, fuck this bitch. If I lose my job, I'm going to bust a cap in this bitch [making a hand gesture simulating a gun]. |
| Mr. Harvey: | I told you what I was going to do if you ever said something like that to me again.[5] |
| Mr. Moore: | Fuck her. Fuck you. |

Mr. Harvey testified he had "no idea what this man was going to do." Without further discussion, Mr. Harvey went back into the courtroom and renewed his motion to withdraw. He also told the court that he would reveal Mr. Moore's statements to him if the court ordered him to, which the court did. After hearing Mr. Harvey's account of Mr. Moore's comments, the court immediately ordered Mr. Moore to be detained and subsequently granted Mr. Harvey's withdrawal motion.[6]

---

[5] But see *supra* note 4.

[6] On cross-examination, Mr. Harvey acknowledged that he also told the court that his relationship with Mr. Moore was "horrible" and "[u]nhealthy," that their discussions had become "unprofessional" because of the profane language both men

In addition to this testimony from Mr. Harvey and its two other witnesses, the government introduced into evidence silent surveillance footage from June 29, 2018, capturing the second of the two conversations in the courthouse corridor when Mr. Harvey claimed Mr. Moore had threatened the AAG, as well as still photographs taken from the video footage.  Mr. Harvey's grand jury testimony was admitted into evidence in the defense case.  Mr. Moore did not testify.  The jury quickly convicted Mr. Moore on all counts of threatening a public official and obstructing justice.

### B.      Analysis

On appeal, Mr. Moore argues that the government failed to prove that he had the requisite mens rea to support either of his convictions.  Although he briefed this argument after his evidentiary claim, we address it first for two reasons: (1) "the Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding," *Gray v. United States*, 155 A.3d 377, 389 n.21 (D.C. 2017) (internal quotation marks and brackets omitted), meaning Mr. Moore's evidentiary claim would be moot should he prevail on his sufficiency claim, and (2) "even

---

used with each other, and that he had "never wanted to remove [him]self from a situation as badly as [he] wanted to remove [him]self from this one."

improperly admitted evidence may be considered in evaluating the sufficiency of the evidence," *Mitchell v. United States*, 985 A.2d 1125, 1134-35 (D.C. 2009) (internal quotation marks omitted), meaning that even if we concluded that Mr. Moore's statements to Mr. Harvey were protected by attorney-client privilege and should not have been admitted at trial, we would have to consider these statements in assessing whether the government proved its case against him.

We review sufficiency claims de novo. *In re S.W.*, 45 A.3d 151, 154 (D.C. 2012). "When assessing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, giving full play to the right of the fact-finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Miller v. United States*, 209 A.3d 75, 77 (D.C. 2019) (internal quotation marks and brackets omitted). "The evidence is sufficient if . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

## 1.     Threats Against Public Officials

In a two-paragraph argument, Mr. Moore asserts the government's evidence was insufficient to prove that he threatened a public official under D.C. Code § 22-851(c) (providing a criminal penalty for "[a] person who stalks, threatens,

assaults, kidnaps, or injures any official or employee . . . while the official or employee is engaged in the performance of his or her duties or on account of the performance of those duties") because the government did not prove that he intended for his statements to reach the AAG who prosecuted him for contempt. Our analysis is limited to this argument. *See, e.g.*, *Sutton v. United States*, 988 A.2d 478, 483 (D.C. 2010) (considering sufficiency of the evidence for only the elements of the crime challenged by the defendant).

Mr. Moore provides no support for the argument that proof of such a mens rea element is required to establish guilt under D.C. Code § 22-851(c). He cites to only one case from this jurisdiction, *Carrell v. United States*, 165 A.3d 314 (D.C. 2017) (en banc), and appears to assert that this court implicitly held that, in *any* threats prosecution, "the government must prove intent for the statement (the conduct) to reach the target (the result)" because "without that, the statement cannot be intended to threaten the target."[7]

Mr. Moore's reliance on *Carrell* is misplaced. Sitting en banc, this court

---

[7] Mr. Moore also cites to an intermediate appellate court decision from Massachusetts, *Commonwealth v. Maiden*, 810 N.E.2d 1279, 1281 (Mass. App. Ct. 2004). He provides no explanation as to how that out-of-jurisdiction decision informs our understanding of D.C. Code § 22-851(c). *See id.*

reaffirmed in *Carrell* that the actus reus elements of felony and misdemeanor threats under D.C. Code § 22-407 and § 22-1810 are that the defendant "(1) uttered words to another person (2) with a result that the ordinary hearer would reasonably . . . believe that the threatened harm would take place." 165 A.3d at 320 (internal brackets, quotation marks, and footnote omitted). We also made clear that "the government must prove the defendant's mens rea to utter the words as a threat, and that it may do so by establishing that the defendant acted with the purpose to threaten or with knowledge that his words would be perceived as a threat." *Id.* at 317. But we did not address whether (much less hold that) the government must prove that the defendant's purpose was for the threat to reach the target, rather than some other person.

Certainly we agree that the offense of threats to public officials—like felony and misdemeanor threats—does not criminalize thoughts in one's head and therefore requires proof that the defendant communicated a threatening statement to *someone* with the intent (in the sense of purpose or knowledge) that the statement will be perceived as a threat.[8] But, in the absence of any substantiated argument as to why

---

[8] As the government notes, we have held that the crime of threatening under § 22-1810 "[is] complete as soon as the threat [is] communicated to a third party, regardless of whether the intended victim ever [knows] of the plot." *Beard v. United States*, 535 A.2d 1373, 1378 (D.C. 1988); *see also Gurley v. United States*, 308 A.2d

a threat against a public official must be made with the purpose or knowledge that that specific individual will hear the threat, *cf. Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008) (observing that it is generally "not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work" (internal quotation marks omitted)), we are unpersuaded that the evidence was insufficient on this basis.[9]

---

785, 787 (D.C. 1973); *Jackson v. District of Columbia.*, 541 F. Supp. 2d 334, 343 (D.D.C. 2008). But all that means is that the actus reus element of threatening does not require the threat to reach the intended victim (at least under the criminal threats statute); it does not address whether the defendant must have the purpose or knowledge that the threat will reach the victim.

[9] It is undoubtedly the case that, when a threat is delivered only to a third party, that fact can bear on other elements of the offense. For one, it may bear on one's "mens rea to utter the words as a threat." *Carrell*, 165 A.3d at 317; *see also, e.g.*, *United States v. Houston*, 792 F.3d 663, 665, 667-68 (6th Cir. 2015) (analyzing a conviction under 18 U.S.C. § 875, a federal threats statute, and holding that, when the incarcerated defendant speaking by phone to his girlfriend said, "I'll kill that motherf[***]er," referring to his former attorney, a jury could reasonably infer that the defendant was "caught . . . in a fit of rage in a prison cell . . . [and] that he was venting his frustration to a trusted confidante rather than issuing a public death threat to another"). Likewise, it may bear on the actus reus element that an "ordinary hearer would reasonably . . . believe that the threatened harm would take place." *Carrell*, 165 A.3d at 320 (internal brackets omitted); *cf. Black v. United States*, 755 A.2d 1005, 1008 n.7 (D.C. 2000) (holding that a defendant's words were "of such a nature as to convey fear of serious bodily harm or injury to the ordinary hearer" where he not only stated to a third party that he planned to "put a cap in [the intended victim's] hand," but "asked [the third party] to convey the threatening message to [the intended victim]" (internal quotation marks omitted)). But, as noted above, Mr. Moore has not challenged the sufficiency of the evidence on these grounds.

## 2.    Obstruction of Justice

Mr. Moore also argues that the evidence was insufficient to prove he obstructed justice under D.C. Code § 22-722(a)(5) ("A person commits the offense of obstruction of justice if that person[] . . . [i]njures or threatens to injure any person . . . on account of the person or any other person performing [their] official duty as a juror, witness, or officer in any court in the District of Columbia . . . ."). Specifically, he asserts that "[o]bstruction of justice 'is a specific intent crime requiring intent to impair the proceeding,'" relying on *Hawkins v. United States*, 119 A.3d 687, 695 (D.C. 2015),[10] and that the government did not prove that he intended to impair the proceedings of his contempt trial. We discern no insufficiency on this basis.

To begin, we agree with the government's statement that "obstruction under [this] subsection[] can include retaliation for past events, and does not require intent to impair ongoing, or future, official proceedings." *Cf. Mayhand v. United States*, 127 A.3d 1198, 1204 (D.C. 2015) (acknowledging a retaliatory act against an

---

[10] *Hawkins* predates this court's en banc "endorsement of more particularized and standardized categorizations of mens rea" in lieu of "specific" and "general" intent in *Carrell*, 165 A.3d at 324.

individual "on account of" information given to law enforcement constitutes obstruction under analogous subsection § 22-722(a)(4)); *McCullough v. United States*, 827 A.2d 48, 58 (D.C. 2003) (holding § 22-722(a)(4) "was satisfied because [a witness] was killed in retaliation for giving information to the police about criminal activity"). Nonetheless, as Mr. Moore points out, the history of the statute strongly suggests that all obstruction of justice crimes require proof of mens rea of some kind. *See* The "Law Enforcement Witness Protection Amendment Act of 1992," D.C. Council, Comm. on the Judiciary, Report on Bill 9-385 at 3 (May 20, 1992) ("Specific knowledge and intent are required for threatening or intimidating conduct to be actionable. The intent requirement embraces in comprehensive terms various forms of obstruction of justice . . . ."). Thus, the fact that obstruction may be accomplished by a retaliatory act does not obviate proof of "specific intent" that we have said is required for this crime; it simply means that an act of retaliation is subject to its own intent requirement, i.e., the intent to retaliate.

It does not follow, however, as Mr. Moore argues, that "[t]here can be no obstruction without a threat specifically intended to reach" the AAG who prosecuted him for contempt. Again, assuming in the absence of any persuasive argument to the contrary, see *supra* section I.B.1, that the government proved the elements of threats against a public official, a rational juror could have concluded that Mr.

Moore's purpose in uttering that threat was to retaliate against the AAG.

We thus reject Mr. Moore's sufficiency arguments about mens rea, and turn to his argument that the government never should have been permitted to present Mr. Harvey's testimony to the jury to begin with.

## II.     Attorney-Client Privilege

### A.     Additional Motion Facts and Procedural History

As noted above, after Mr. Harvey reported Mr. Moore's threats against the AAG prosecuting the contempt case, the trial court reluctantly granted Mr. Harvey's motion to withdraw from representing Mr. Moore.[11]  It appears the court informed the U.S. Marshal's Service (which provides security for the courthouse), which then contacted the U.S. Attorney's Office.  The USAO subsequently called Mr. Harvey

---

[11] The court expressed reservations about the ethical necessity of Mr. Harvey withdrawing, given that Mr. Moore's alleged threats against the AAG did not, in the court's view, create any conflict of interest between Mr. Harvey and Mr. Moore with respect to the contempt case.  The court also seemed to question the sincerity of Mr. Moore's statements to Mr. Harvey, noting that "people make threats all the time to get a judge off the case, to get a prosecutor off a case, [or] to get an attorney off a case."  The court ultimately yielded, however, to Mr. Harvey's representations that his ability to communicate with Mr. Moore had completely broken down.

to testify before a grand jury,[12] which returned an indictment against Mr. Moore for two counts of obstructing justice under D.C. Code § 22-722(a)(5) and two counts of threatening a public official under D.C. Code § 22-851(c) (one set of charges pertaining to Mr. Moore's April statements and the other pertaining to his June statements).

Prior to trial, Mr. Moore filed a motion in limine to exclude Mr. Harvey's anticipated testimony about his communications with Mr. Moore. In support of his motion, he argued that "[a]ny conversation between Mr. Moore and Mr. Harvey debriefing [after] hearing[s]" in his contempt case was "presumptively" covered under the blackletter formulation of the attorney-client privilege, see *infra* section II.B.2, and that "the [g]overnment ha[d] not overcome that [presumption] via the crime-fraud or any other exception to the privilege." In its opposition to the motion, the government argued that Mr. Moore's threatening statements did not meet the requirements for attorney-client privilege; it also disavowed any reliance on the crime-fraud exception for its position. In reply, Mr. Moore challenged the

---

[12] Although the grand jury is a judicial proceeding in which the attorney-client privilege may protect client confidences from disclosure, *In re Pub. Def. Serv.*, 831 A.2d 890, 902 (D.C. 2003), there is no indication in the record that Mr. Moore was given an opportunity at this juncture to litigate whether his statements to Mr. Harvey were protected by attorney-client privilege.

government's "piecemeal" approach, focusing on individual statements made to Mr. Harvey and considering whether they were requests for legal advice in isolation. Mr. Moore argued that the court should consider these statements in the context of their entire conversation, which he asserted was more consistent with the purpose and constitutional significance of the attorney-client privilege.

At a motions hearing in February 2019, Mr. Moore reiterated his written arguments. Emphasizing that the types of statements Mr. Harvey alleged him to have made were "textbook [for how] we would expect [a] defendant" to react in a criminal proceeding "not . . . in [a] vacuum[, . . . but] in real li[fe]," he argued that such "reaction[s]" to an attorney's "explanation . . . about . . . why prosecutors take certain actions" were sufficiently "related to . . . legal advice" to be protected by attorney-client privilege. He also warned that the court would "eliminate the privilege almost altogether" and run afoul of existing case law if it "pars[ed] out specific lines or specific words" in attorney-client communications to determine if they were privileged. Acknowledging that the attorney-client privilege might "capture things that are untoward," he argued such a result would be justified because society should want defendants to share their "honest and real" feelings with their lawyers and "to feel comfortable enough to say [even] ill-advised things." In response, the government argued that existing case law extended attorney-client

privilege only to "communications made with respect to a request for legal advice," which, it argued, Mr. Moore's statements were not. The government also asserted that Mr. Moore was asking the court to "create a [new] rule"—or at least "expand the previous interpretation of privilege"—such that "essentially any communication with a defense attorney with respect to an ongoing case . . . would all be privileged."

The court denied Mr. Moore's motion to preclude Mr. Harvey from testifying at trial. Initially, it reasoned that Mr. Harvey's "clear[] and unambiguous[]" warning on April 12, 2018, that he would reveal any future threatening statements (per his grand jury narrative) "change[d] the context" by "telling [Mr. Moore] that . . . the confidentiality of [Mr. Moore's] communications [with Mr. Harvey would] no longer apply." It concluded that "under these circumstances," Mr. Moore's "statements were not within even a broad understanding of the seeking of legal advice" and thus it was "not over[-]parsing" to deem them unprotected by attorney-client privilege.

Because of the court's reliance upon Mr. Harvey's April 12 warning to Mr. Moore to support its finding that Mr. Moore's June 29 statements were not covered by attorney-client privilege, Mr. Moore asked whether the court would "consider precluding [Mr. Harvey's] testimony about the threat that occurred prior to the

warning . . . on April 12th." The court subsequently clarified that the warning was not load-bearing, and that it would allow Mr. Harvey to testify about both conversations. The court acknowledged that Mr. Moore was "clearly seeking legal advice" when he asked "why is she, referring to [the AAG], doing this," at the outset of his April 12 conversation with Mr. Harvey in the hallway. But the court explained that the "extended monologue" that followed "about the violent actions" Mr. Moore contemplated taking against the AAG was just an expression of "anger based on the legal advice." Accordingly, the court concluded the April statements were no more protected by the attorney-client privilege than were Mr. Moore's June 29 statements. The court elaborated that Mr. Moore's "anger [was] completely understandable, and . . . not . . . unreasonable in any way," but nevertheless ruled that the communication of that anger was "not related to the legal advice about how to proceed at trial[,] . . . to trial strategy[,] . . . to defenses[,] . . . to cross examination of witnesses[,] . . . [or] to anything except the desire to kill the prosecutor."

## B.    Legal Analysis

This case turns on identifying where the boundaries of the attorney-client privilege lie in the context of communications between a criminal defendant and their court-appointed counsel, and specifically when it can be said that a defendant

is seeking legal advice from counsel related to their court appointment. Because the legal questions predominate,[13] *see In re Pub. Def. Serv.* (*In re PDS*), 831 A.2d 890, 897-98 (D.C. 2003), and in the absence of any argument to the contrary by the government, we agree with Mr. Moore that our review is de novo.

We emphasize at the outset that the only question before us is the scope of this evidentiary privilege, held by a client, which abrogates a person's "general duty to give what [sworn] testimony one is capable of giving" in a judicial proceeding. *Jaffee v. Redmond*, 518 U.S. 1, 9 (1996) (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)). Our concern is not whether and when counsel may ethically disclose information that a person is in danger, a discretionary decision which is governed by the Rules of Professional Conduct. *See* D.C. R. Prof. Conduct 1.6.[14]

---

[13] Although Mr. Moore does not concede that he made threats against the AAG, he argues that such statements would be privileged even if he made them.

[14] *See also* D.C. R. Prof. Conduct 1.6 cmts. [6]-[8] ("This rule is not intended to govern or affect judicial application of the attorney-client privilege."); *Adams v. Franklin*, 924 A.2d 993, 998 (D.C. 2007) (explicating that "[a]lthough a court order to compel testimony vitiates Rule 1.6, there still exists the independent basis found in the attorney-client privilege to preclude compelled disclosure of privileged communications"); *Newman v. State*, 863 A.2d 321, 332 (Md. 2004) ("There is a subtle relationship between the confidentiality required under Rule 1.6 and the evidentiary rule of the attorney-client privilege. . . . The attorney-client privilege applies in judicial and other proceedings in which an attorney may be called as a witness or otherwise required to produce evidence adverse to his client. The rule of confidentiality embodied in Rule 1.6, however, applies in all other situations that do not involve the compulsion of law." (internal citations omitted)).

The fact that the Rules of Professional Conduct may permit counsel to make a disclosure "tells us nothing about the admissibility of the information . . . disclosed." *Purcell v. Dist. Att'y for Suffolk Dist.*, 676 N.E.2d 436, 438 (Mass. 1997).

We begin with a review of the animating principles of the attorney-client evidentiary privilege. We then discuss the cases in which these principles have been typically applied, distinguish criminal defense cases involving court-appointed attorneys, and explain why the privilege logically applies more expansively in the latter context. Lastly we apply our analysis to this case, concluding that Mr. Moore's statements to Mr. Harvey were protected by attorney-client privilege.

## 1. Animating Principles

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law," *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981), and is an integral component of our adversarial justice system, *In re PDS*, 831 A.2d at 900 ("Underlying the attorney-client privilege is the premise that the lawyer and the law office are indispensable parts" of our adversarial justice system. (internal quotation marks omitted)). Understanding the rationale of the privilege is central to its proper application. *See Upjohn*, 449 U.S. at 392 (rejecting

a formulation of the privilege that would "frustrate[] [its] very purpose").[15]

The privilege is based on the "fundamental principle" that maintaining the confidentiality of communications between an attorney and their client promotes "the ends of justice":

> [P]rofessional communications made by a client to his counsel[] are always to be excluded from the jury . . . [because unless] clients [can safely] mak[e] full and confidential communications to their counsels, and unless they . . . actually do so, the ends of justice could not in many cases be attained.

*State v. Douglass*, 20 W. Va. 770, 780 (1882) (emphasis removed) (cited in John Wesley Hall, Jr., *Prof. Resp. Crim. Def. Prac. 3d* § 28:3 n.9 (2021 Update)). To begin, the privilege recognizes that "[l]awyers cannot give sound legal advice without being apprised of all pertinent facts, no matter how embarrassing or inculpating," and that lawyers would be chilled from truly engaging with their clients and clients would be chilled from "shar[ing] confidences [with their lawyers] if . . .

---

[15] The observation, repeated by the dissent, *see post* at 65-66, that the privilege should be "strictly confined within the narrowest possible limits consistent with the logic of its principle," *In re Grand Jury Investigation*, 599 F.2d 1224, 1235 (3d Cir. 1979) (internal quotation marks omitted); *see also Jones v. United States*, 828 A.2d 169, 174-75 (D.C. 2003); *In re Sealed Case*, 676 F.2d 793, 806-07 (D.C. Cir. 1982); *United States v. Ivers*, 967 F.3d 709, 716 (8th Cir. 2020), only underscores the need to understand what, precisely, the logic of the principle demands.

lawyers could be turned into witnesses against the[ir clients]." *In re PDS*, 831 A.2d at 900 (internal quotation marks omitted); *see also Upjohn*, 449 U.S. at 390 (recognizing that "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice").[16]

Moreover, the attorney-client privilege is not reserved only for those clients who seek legal advice in order to comply with the law. To the contrary, the privilege, "in its very fundamentals, presupposes . . . the furnishing of legal advice to the culpable client," 8 *Wigmore on Evidence* § 2298, at 572 (McNaughton rev. 1961),

---

[16] Our dissenting colleague concedes that this rationale is "long reflected in case law," but cites an article for the proposition that "empirical evidence does not support the assumption that clients rely on a guarantee of *absolute confidentiality* when they decide whether to be candid with their lawyers." *Post* at 56 n.3 (emphasis added). The dissent appears to conflate ethical principles of confidentiality with the evidentiary attorney-client privilege. But in any event, the longstanding rationale for the attorney-client privilege is not undermined by one study which appears to show that clients will confide in counsel when they believe counsel are generally obligated to keep their confidences. *See* Elisia M. Klinka & Russell G. Pearce, *Confidentiality Explained: The Dialogue Approach to Discussing Confidentiality with Clients*, 48 San Diego L. Rev. 157, 173 (2011) (noting that when respondents in the cited study "were asked whether they would . . . withhold information if the lawyer 'promised confidentiality except for specific types of information which he/she described in advance,'" a small number—only 15.1%—reported that 'they would withhold' information from their lawyer" (citing Fred C. Zacharias, *Rethinking Confidentiality*, 74 Iowa L. Rev. 351, 386 (1989))).

because a lawyer's advice "is even more vital when the client misguidedly contemplates or proposes actions that the client knows to be illegal," *In re PDS*, 831 A.2d at 901. "The existence of the attorney-client privilege encourages clients to make such unguarded and ill-advised suggestions to their lawyers," who are then ethically,[17] and in the criminal context constitutionally,[18] obliged "in the interests of justice and the client's own long-term best interests[] to urge the client, as forcefully and emphatically as necessary, to abandon illegal conduct." *Id*.; *see also Nix v. Whiteside*, 475 U.S. 157, 169 (1986) (noting that a lawyer's "first duty . . . is to attempt to dissuade the client from [an] unlawful course of conduct"). Indeed, the reality, as this court has stated, is that "discouraging clients from illegal conduct is a regular occurrence in an attorney's practice." *In re PDS*, 831 A.2d at 901. The privilege recognizes that "[t]he sincere counsel of a trusted advisor will persuade many clients to comply with the law," *id.*, and thus that ensuring the meaningful assistance of counsel generally promotes the rule of law and the administration of

---

[17] *See, e.g.*, D.C. R. Prof. Conduct 1.3(a) (obligating counsel to zealously and diligently represent their client "within the bounds of the law"); D.C. R. Prof. Conduct 3.3(b) (obligating counsel to dissuade witnesses from giving false testimony); D.C. R. Prof. Conduct 1.16(a)(1) (obligating counsel to withdraw from representation where it would "result in violation" of law).

[18] *See* U.S. Const. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (recognizing the right to effective representation).

justice.[19]

As a corollary to this point, the narrow crime-fraud exception to the privilege applies only to communications made to *further* ongoing or future crimes. *In re PDS*, 831 A.2d at 906. Communications with a client made in an attempt to dissuade a client from criminal activity do not fall within this exception and are still privileged. *See* 8 *Wigmore on Evidence* § 2298, at 572-73 (explaining the crime-fraud exception applies when "the client i[s] concerting with the attorney [in] a *crime* or other evil enterprise"); *see also In re PDS*, 831 A.2d at 895 (explaining the "crime-fraud exception does not apply where the attorney talks the client out of committing the crime or fraud he contemplates or stops the client's scheme dead in its tracks"); *Newman*, 863 A.2d at 336 (crime-fraud exception did not apply to client's stated plans to harm her children, vocalized to her attorney, because "[t]o permit the mere statement of intent to defeat the attorney-client privilege would result in the exception swallowing the privilege.").

---

[19] There is also a line of jurisprudence which grounds attorney-client privilege in the privacy rights of the client. *See, e.g.*, *State v. Sugar*, 417 A.2d 474, 479-80 (N.J. 1980) (observing that "[i]f the rule of law is this nation's secular faith, then the members of the Bar are its ministers"; "[t]he necessity of full and open disclosure by a defendant imbues that disclosure with an intimacy equal to that of the confessional"; and "[a]ny interference with th[is] intimate relationship . . . may do profound violence to the individual privacy of the client" (citations omitted)).

In short, "[b]y encouraging full and frank discussions between attorneys and their clients" about past or even future criminal activity, the attorney-client privilege not only fosters effective representation in individual cases, but also "promotes broader public interests in the observance of law and the administration of justice." *In re PDS*, 831 A.2d at 900 (citation and internal brackets omitted).

### 2. The Blackletter Formulation of the Privilege in Different Contexts

This court has adopted the blackletter formulation of the attorney-client privilege set forth in *Wigmore*:

> (1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

8 *Wigmore on Evidence* § 2292, at 554. Although this formulation is still the one to which so many jurisdictions, including our own, *see Jones v. United States*, 828 A.2d 169, 175 (D.C. 2003), cede definitional authority, courts have debated the precise contours of its criteria for several hundred years, 8 *Wigmore on Evidence* § 2290, at 542-45, with countless decisions examining the content and circumstances of a communication to determine if it is protected—in other words, how far the scope of the privilege extends.

Relatively few decisions, however, have explored these questions in the context of the relationship between a criminal defendant and court-appointed counsel. *Wigmore*'s discussion of attorney-client privilege is replete with descriptions of small-town lawyers encountering moral quandaries as they counsel villagers on all matters of law and life.[20] Although *The New Wigmore* provides a more contemporary illustration of attorney-client communications, its analysis, tracking the available case law, is focused overwhelmingly on those in civil and corporate spheres: for example, how far the privilege extends when "[t]he client . . . consult[s] the attorney . . . as a business advisor," as an "investment advisor," or as a "lobbyist, accountant, political advisor, labor negotiator, or interpreter." Edward J. Imwinkelried, *The New Wigmore: Evidentiary Privileges* § 6.11.1, at 952-53 (2010) [hereinafter *New Wigmore*] (citations omitted) (concluding that the privilege does not extend to cover those communications). Accordingly, much of the discussion regarding the application of attorney-client privilege, including the seminal case, *Upjohn*, 449 U.S. 383, relates to concerns about canny attorneys and

---

[20] *See id.* § 2296 at 569 ("[T]he prosecuting attorney of the county, in most of the states elected by popular vote, is often the chief confidant and consultant of the local citizens in all sorts of trouble . . . ."); *id.* § 2303 at 584 ("In view of the frequency with which some persons seek to obtain informally and gratuitously valuable legal advice, and the lamentable frequency with which attorneys submit to such an imposition, especially in rural communities, it is often difficult to determine whether the consultation is a professional one . . . .").

businesspeople manipulating the principle to shield virtually all their communications from litigation. *See New Wigmore* § 6.9.1, at 863 ("Because modern corporations control such vast amounts of information, the risk is that an expansive application of the attorney-client privilege to corporate entities will materially interfere with the operation of the justice system."). But these concerns have little or no application to the relationship between a person accused of committing a crime and their court-appointed counsel.

And yet, the attorney-client privilege plays perhaps its most important role for the criminal defendant. Given the highest of stakes—a loss of liberty or even life— we recognize the critical import of "[a] criminal defendant's ability to communicate candidly and confidentially with his lawyer" and consider "the right to privately confer with counsel [a]s nearly sacrosanct." *Nordstrom v. Ryan*, 762 F.3d 903, 910 (9th Cir. 2014). And although the privilege is not constitutional in origin, *see* 8 *Wigmore on Evidence* § 2290, at 542, a violation of it can doubtless implicate both the Fifth Amendment right against self-incrimination, since a "criminal defendant's self-incrimination rights become completely nugatory if compulsory disclosure can be exacted through his attorney," and the Sixth Amendment right to the effective assistance of counsel, since "[t]he effectiveness of counsel is only as great as the confidentiality of its client-attorney relationship," *People v. Belge*, 372 N.Y.S.2d

798, 801, 802 (N.Y. Co. Ct. 1975) (internal quotation marks omitted), *aff'd*, 376 N.Y.S.2d 771 (N.Y. App. Div. 4th Dept. 1975), *aff'd*, 359 N.E.2d 377 (N.Y. 1976); *see also State v. Kociolek*, 129 A.2d 417, 424 (N.J. 1957) (characterizing the privilege as "indispensable to the fulfillment of the constitutional security against self-incrimination and the right to make defense with the aid of counsel").

What is more, the import of the attorney-client privilege is arguably at its apex when a criminal defendant is appointed counsel. A criminal defendant who has not hired their lawyer and is not paying their bills may not have the same confidence as a paying client that the lawyer is serving their interests and not those of the government. *See generally* Jonathan D. Casper, *Did You Have a Lawyer When You Went to Court? No, I Had a Public Defender.*, 1 Yale Rev. L. & Soc. Action 4, 4-9 (1971). To the contrary, given that the government that is prosecuting an indigent defendant is also providing them with counsel, a defendant may well perceive appointed counsel to be a hostile agent. Typically, such a defendant

> meets [their] lawyer for the first time in the cell block . . .
> . [They] did not choose the lawyer, nor do[] [they] know
> [the lawyer]. The lawyer has been sent by the judge and
> is part of the system that is attempting to punish the
> defendant. It is no easy task to persuade this client that
> [t]he[y] can talk freely without fear of prejudice.

Monroe H. Freedman, *Professional Responsibility of the Criminal Defense Lawyer: The Three Hardest Questions*, 64 Mich. L. Rev. 1469, 1473 (1966). In this context,

the trust that the privilege is meant to foster by strictly limiting counsel's ability to become a witness against their client is a critical means of ensuring a meaningful attorney-client relationship. *See id.* ("[A criminal defense lawyer] will not be successful unless [they] can convince the client that full and confidential disclosure to [the] lawyer will never result in prejudice to the client by any word or action of the lawyer.").

**3.     Ensuring the Attorney-Client Privilege Achieves Its Purpose in the Context of Court-Appointed Counsel for Criminal Defendants**

*Wigmore*'s formulation of the privilege requires the existence of a relationship "[w]here legal advice of any kind is sought . . . from a professional legal adviser in his capacity as such." 8 *Wigmore on Evidence* § 2292, at 554. It thus encompasses advice from a lawyer regarding any sort of actual or potential litigation,[21] as well as legal advice about non-litigation matters, but excludes "[a]dvice sought for sundry

---

[21] Although the privilege at one point attached only to particular litigation at bar, it expanded to include *any* litigation, including litigation in contemplation. 8 *Wigmore on Evidence* § 2294-95, at 558-66. Imwinkelried clarifies that today, "[l]itigation need not even be threatened"; rather, the privilege covers "any consultations for legal advice, wholly irrespective of litigation or even of controversy." *New Wigmore* § 6.11.1, at 954-55 (internal citations and quotation marks omitted).

nonlegal purposes," *id.* § 2296, at 566, such as advice given by attorneys, particularly those in business law and related fields, who may wear other, nonlegal hats. *See, e.g.*, 1 Edna Selan Epstein, *The Attorney Client Privilege and the Work Product Doctrine* 336 (5th ed. 2007) ("[F]or the privilege to be applicable, the lawyer must act in a legal capacity, rather than perform any of the other functions [of] law-trained individuals in our society."); *see also* Elizabeth Chambliss, *The Scope of In-Firm Privilege*, 80 Notre Dame L. Rev. 1721, 1727 (2005) ("[C]ourts have denied the protection of privilege where the in-house lawyer was found to be acting as a business adviser, negotiator, or in some other nonlegal role." (footnotes omitted)); Arthur Best, 1 *Wigmore on Evidence Supplement* § 2296, at 1538-39 (2014) (giving examples, such as "where the attorney acted as a claims adjuster" or records made by a "store's risk management and loss control department"). In short, "[t]he client must consult the attorney in the capacity as a *legal* advisor . . . ." *New Wigmore* § 6.11.1, at 952 (emphasis added) (citations omitted). This court recognized the need for a legal relationship for the privilege to apply in *Jones*, 828 A.2d at 173-75, 177, rejecting application of the privilege to the defendant's communications with his girlfriend (who happened to be an attorney) when made in the context of a romantic, rather than attorney-client, relationship.

We have no trouble concluding that the relationship between a defendant and

their court-appointed counsel is generally one within which the client is seeking (and counsel is providing) legal advice within the meaning of the attorney-client privilege. Unlike many of the civil contexts that *Wigmore* examines, such a relationship has no nonlegal objectives. The only reason the client has been paired with counsel is the client's need for (and entitlement to) counsel; and counsel's sole role is to zealously represent their client in the court-appointed matter. The thornier question, to which we now turn, is determining when a client's particular communications with court-appointed counsel are related to that purpose.

It is clear that a communication need not itself be explicitly about a legal matter to relate to a legal purpose. *See, e.g.*, *Jones*, 828 A.2d at 176-77 (noting that appellant's "'scientific' questions about whether or not his fingerprints might remain on a glass or whether his semen and hair might be discovered in the bathroom . . . might fall within the privilege if they were expressed in a communication within a clearly established attorney-client relationship"). But this court has never addressed where the line between related and unrelated communications lies, particularly in the context of court-appointed attorneys and criminal defendants.

"In general, American decisions agree that the privilege applies if one of the significant purposes of a client in communicating with a lawyer is that of obtaining

legal assistance." *Jones*, 828 A.2d at 175 (quoting Restatement (Third) of the Law Governing Lawyers § 72 reporter's note (Am. L. Inst. 2000)); *see also* 8 *Wigmore on Evidence* § 2310, at 599 ("[T]he client cannot know what is necessary or material . . . . The test is, therefore, not whether the . . . statement is actually necessary . . . to the subject of the consultation, but whether the statement is made as *a part of the purpose of the client* to obtain advice on that subject." (internal citations omitted)). The key consideration is "[*w*]*hy* . . . the person ma[d]e the statement to the attorney," *New Wigmore* § 6.11, at 935 (emphasis added). So construed, the "significant purpose" test sensibly operates in many contexts to exclude communications that are only "tangentially related" to a legal purpose, *Att'y Gen. of U.S. v. Covington & Burling*, 430 F. Supp. 1117, 1121-22 (D.D.C. 1977), particularly where the attorney and the client are mutually engaged in both legal and nonlegal activities, *see id.* (concluding that communications regarding Covington & Burling's extensive dealings with bauxite consultants and purchasers were unrelated to the nation of Guinea's legal purpose).

But in other contexts, particularly those involving pro bono or court-appointed attorneys, the "significant purpose" test has been by operation much more permissive. The Massachusetts Supreme Judicial Court acknowledged this in *Purcell v. District Attorney for Suffolk District*, 676 N.E.2d 436, 441 (Mass. 1997),

where the appellant informed a legal aid attorney of "his intention to commit arson." The court concluded that the privilege applied to the communication because it was undisputed that "[the appellant] consulted [the lawyer] concerning his impending eviction," the lawyer "is a member of the bar, and [the appellant] either was or sought to become [the lawyer's] client." *Id.* ("This is not a case in which our traditional view that testimonial privileges should be construed strictly should be applied."). Similarly in *State v. Boatwright*, 401 P.3d 657, 664-65 (Kan. Ct. App. 2017), the Court of Appeals of Kansas rejected the government's argument that "[the appellant's] threat [to kill his ex-fiancée, made to his court-appointed defense attorney,] . . . had no relationship to [the attorney's] representation of [the appellant]." The court concluded that the threats were made "during the course of [the attorney's] representation of [the client], specifically during [a] meeting . . . to discuss a plea offer," in a case in which the client was charged with violating a protective order and stalking his ex-fiancée. *Id.* at 660, 664. "Although [the client's] comment [was] jarring in isolation," the court recognized that "the expression of such frustrations is not an uncommon occurrence in the course of an attorney-client relationship, . . . and may serve as a springboard for discussion and attempts to dissuade the client on the part of the attorney." *Id.* at 664-65 (internal quotation

marks omitted).[22]

For multiple reasons, we likewise apply the significant purpose test permissively in the context of communications between a client and their court-appointed criminal defense attorney that are made during the course of that representation.

First, as discussed, the typical relationship between a defendant and their court-appointed counsel has only one objective: representation in the ongoing criminal case. There is perforce a strong presumption that, any time the client speaks to their court-appointed lawyer, a significant purpose of that communication is to receive legal advice in the case for which the lawyer has been appointed to represent them.

---

[22] We disagree with the government and our dissenting colleague that *Boatwright* is distinguishable because it concerns Kansas's statutorily recognized attorney-client privilege. Kansas's statute merely codifies *Wigmore*'s formulation of the privilege. *State v. Munyon*, 726 P.2d 1333, 1337 (Kan. 1986). And while it is true, as the government points out, that the Kansas Supreme Court has explicitly interpreted the third element of *Wigmore*'s formulation—"the communications relating to that purpose," 8 *Wigmore on Evidence* § 2292, at 554—to mean "communications made in the course of that relationship," *Munyon*, 726 P.2d at 1337, that does not undermine our analysis. To the contrary, it buttresses our expansive application of the privilege in the context of communications between defendants and their court-appointed attorneys, see *infra*.

Second, as also discussed, for a court-appointed attorney-client relationship to be meaningful, there must be room for the kind of wide-ranging conversation that establishes genuine trust. *See New Wigmore* § 6.11, at 935 (acknowledging that in any privileged relationship there must be some "'space' [for the relationship] to flourish" (citation omitted)); *see also* 1 Paul R. Rice, *Attorney-Client Privilege in the U.S.* § 5:21 (2021) ("[An] open, dynamic, and unguarded atmosphere" is the "very goal" of an attorney-client relationship.). Communications between the client and their court-appointed attorney may be meandering, filled with digressions, detours and emotional outbursts—but these communications are central to the enterprise, not distractions or nuisances.[23]

Third, the criminal charges a client faces cannot neatly be segmented from the rest of their life, and even communications that appear to be about something unrelated may nevertheless be intimately connected to how the client experiences the criminal case or impact how the client is able to engage with counsel and present in court. As a general matter, being a criminal defendant is inherently stressful because of the disruptions to personal and family life, and the potentially life-altering

---

[23] It might even be said that the "occurrence [of an outburst] is proof that the privilege has worked to achieve that level of unbridled candor which incentivizes the fulsome information collection essential to optimal lawyering." Rice, § 5:21.

outcomes that hang in the balance. *See generally, e.g.*, Naomi F. Sugie & Kristin Turney, *Beyond Incarceration: Criminal Justice Contact and Mental Health*, 82 Am. Socio. Rev. 719, 719-743 (2017); April D. Fernandes, *How Far Up the River? Criminal Justice Contact and Health Outcomes*, 7 Soc. Currents 29, 29-45 (2020). Defendants with court-appointed attorneys are, by definition, low-income, and are likely to have additional stressors; they will often face "collateral and ancillary . . . issues . . . [such as] adverse immigration consequences, loss of parental rights, loss of housing, seizure of property, [and] loss of employment." *Civil Legal Services Division*, The Public Defender Service for the District of Columbia, https://www.pdsdc.org/about-us/legal-services/civil-legal-services-division; https://perma.cc/5NZJ-FVXH (last visited Nov. 15, 2022). To hold that forceful reactions, frustrated venting, or even verbally violent outbursts categorically fall outside the client's "significant purpose" of seeking legal representation from court-appointed counsel unreasonably imposes a crabbed and technical construction of the privilege on the messiness of human interactions in highly stressful circumstances.[24]

---

[24] Our dissenting colleague does not dispute that criminal defendants confront myriad challenges; indeed the dissent recognizes further systemic and societal constraints, *post* at 68 n.8, particularly those that plague black and brown defendants. But our colleague argues that these challenges should not justify expanding the attorney-client privilege so as to "protect these defendants from prosecution and punishment." *Id*. Setting aside efforts to enlist counsel in criminal activity, we cannot agree that an individual should be prosecuted and punished using the

Fourth, the sort of words or syntax that might alert a court to legal versus nonlegal purposes in many communications simply has no application in the typical court-appointed criminal case. In the corporate setting, there is an entire cottage industry that offers advice to paying clients and their attorneys on how to properly invoke and maintain attorney-client privilege.[25] But it is unrealistic to expect a person with court-appointed counsel to follow such formalistic rules in order to benefit from the privilege. And yet that is what the government advocated at oral argument: when asked if the attorney-client privilege would have protected a defendant who carefully framed a potential threat as a question to court-appointed counsel—e.g., the prosecutor is "out to get me, she's screwing up my life, and I think that things would go much better for me in this case if I just shot her. So I'm going to shoot her. What do you think?"—the government responded that such statements

___

uncensored thoughts and feelings about their case that they have shared with their counsel.

[25] Law firms post checklists to preserve the-attorney-client privilege and attorney work-product on their websites, warning in-house counsel to, for example, (1) "[l]abel privileged communications and attorney work product as such. In top line write 'Attorney-Client Privileged Communication,' 'Confidential' and/or 'Attorney Work Product,' and set it off with capital letters, bold or different font color," (2) "[p]reface communications appropriately. In the first line of body of e-mail, write, 'I am writing to provide legal advice regarding [X]' or 'I am seeking legal advice regarding [Y],'" (3) "put in-house counsel recipient in the 'to' vs. the 'cc' line of the communication" when seeking legal advice, and (4) "[w]here business and legal advice overlap, consider including a preface that the primary purpose of the communication is to provide legal advice." https://perma.cc/N232-TJSS.

"would be privileged."  We reject the suggestion that a statement can relate to the seeking of legal advice only if a defendant has in-house counsel or a lawyer on retainer ready to assist an individual in phrasing a statement in a particular way or prefacing the statement with a verbal marker that the statement is meant to elicit legal advice.

In short, in order for the significant purpose test to have meaning in a court-appointed criminal defense relationship, it must recognize the institutional and human realities and constraints of that relationship.

### 4. Counterarguments from the Dissent and the Government

Our dissenting colleague takes the position that any statement made to counsel that may be construed as a threat to a third party must fall outside the attorney-client privilege.  Apart from conflating ethical rules regarding disclosure of confidences with the evidentiary attorney-client privilege,[26] the dissent argues that we should be

---

[26] See *supra* note 16 (discussing empirical studies about confidentiality).  The dissent also cites to *Nix*, 475 U.S. 157, an ineffective assistance of counsel case about confidentiality and disclosure, not the attorney-client evidentiary privilege.  *Post* at 62 n.4.  In *Nix*, the Supreme Court held a defendant did not receive ineffective assistance of counsel when the attorney dissuaded the defendant from committing

guided by the Supreme Court's reasoning in *Trammel v. United States,* 445 U.S. 40, 51 (1980), *post* at 64, a case about limiting spousal privilege.[27] As for the significant purpose test for attorney-client communications that we apply, the dissent doubles down on a construction of the test from the business world where retained counsel may "w[ear] many hats," *United States v. Mett*, 178 F.3d 1058, 1062 (9th Cir. 1999), disregarding that these situations are a world apart from those in which the only basis for the relationship is a court appointment to fulfill the defendant's right to counsel in a criminal case.[28]

---

perjury by warning the defendant that the attorney would tell the judge the defendant was testifying falsely. *See* 475 U.S. at 171.

[27] *Trammel* rejected an expansive conception of spousal privilege that had been historically grounded in the concept of wives as the legal appendage of their husbands and without independent ability to waive the privilege. 445 U.S. at 44, 52-53. To the extent it has any application to our analysis, it supports our holding that evidentiary privileges are not hidebound to their historical contexts and may be adjusted to accommodate modern realities.

[28] Even in this distinct context, the cases cited by the dissent do not parse attorney-client communications as strictly as the dissent would in this case, i.e., sentence by sentence. *See Mett*, 178 F.3d at 1064-65 (rejecting the government's argument for a broad exception to the privilege and applying "communication-by-communication analysis" by looking at entire formal memoranda containing advice regarding retirement plan administration); *FTC v. Boehringer Ingelheim Pharms., Inc.*, 892 F.3d 1264, 1267-68 (D.C. Cir. 2018) (holding that multiple communications with in-house counsel "[i]n the corporate context" were protected as helping to formulate "settlement and antitrust advice"); *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014) (holding that communications were protected when "one of the significant purposes of [a corporate] internal investigation was to obtain or provide legal advice").

More fundamentally, the dissent shifts focus from the foundational rationale of the attorney-client privilege—fostering trust between attorney and client—to the need to preserve individual "autonomy" and "dignity." *Post* at 67-69. Specifically, the dissent argues that we strip criminal defendants of their autonomy and dignity by failing to hold them accountable for statements that could be construed as threats spoken to their lawyer.[29] We disagree. In recognizing that criminal defendants have a need in our adversarial criminal justice system to be able to trust court-appointed counsel and communicate about the whole of their criminal case, including feelings of fear and anger, we acknowledge their humanity—an essential component of according any individual true dignity.[30]

---

[29] Given that indigent criminal defendants do not get to choose their lawyers, but have lawyers appointed for them, the dissent's assertion that we are "protect[ing] criminal defendants at the price of denying their autonomy," quoting *Douglas v. United States,* 488 A.2d 121, 144-45 (D.C. 1985), *post* at 68, is incongruous. The Appellant in *Douglas* had retained counsel. *Id.* at 127. In that context we observed that we should not "patroniz[e] . . . defendants" and "rob them of their right to choose freely how to present themselves before the law." *Id*. at 144-45. We engage in no analogous robbery here, but rather recognize the reality of a lack of choice for individuals with court-appointed counsel and the impact that has on the attorney-client relationship.

[30] In rejecting the dissent's categorical rule that all statements made to court-appointed counsel that may be construed as threats fall outside attorney-client privilege, we do not embrace the opposite categorical rule and hold that all such statements are protected. Rather, each claim of privilege must still be examined on its facts and the context in which the relevant statements were made. See *infra* Section II.C.

For its part, the government argues that we should narrowly construe the attorney-client privilege to "protect[] only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." We are unpersuaded. To begin with, the Supreme Court case the government cites for the proposition that protected communications must be "necessary" to obtain legal advice, *Fisher v. United States*, 425 U.S. 391 (1976), was not about necessity at all. *Id.* at 403-04. Rather, it was about whether a client could protect pre-existing, non-privileged documents from disclosure merely by providing them to an attorney; the Supreme Court held they could not. *Id.* In other words, *Fisher* does not purport to set a standard for when a communication "relates" to the client's legal purpose; instead, it affirms the proposition that a client may not shoehorn a pre-existing, discoverable document into a protected communication.

The government relies heavily on two appellate decisions from outside this jurisdiction that (mis)interpret *Fisher* as imposing a "necessity" requirement. The first is *United States v. Ivers*, 967 F.3d 709, 716-17 (8th Cir. 2020) (holding that a client's "tirade" at the end of a phone call with his court-appointed attorneys, wherein the client threatened to harm a judge, could be separated from the remainder of the privileged call and was thus not protected by attorney-client privilege); the other is *United States v. Alexander*, 287 F.3d 811, 815-816 (9th Cir. 2002) (holding

that an appellant's threats to kill a number of individuals, which he communicated to his attorney during various phone and mail conversations, were not protected by attorney-client privilege), *abrogated on other grounds by United States v. Plouffe*, 445 F.3d 1126 (9th Cir. 2006). But, as commentators have acknowledged, the approach that the Eighth and Ninth Circuits have adopted does violence to the very core of the attorney-client privilege:

> Testing for *Fisher* necessity in a segmented, utterance-by-utterance manner (*e.g.*, was *that* particular client sentence in search for legal advice?) could hollow out the privilege entirely. If *Ivers* finds a broad following among the federal courts, attorneys may need to pre-caution their clients that over-sharing in an immoderate way during their confidential conversations could cost them the privilege. The resulting negative impact on the attorney-client relationship is difficult to overstate.

Rice, § 5:21 (citations omitted). We cannot endorse an approach so antithetical to the motivating concern behind the attorney-client privilege, especially in the special context of court-appointed counsel for criminal defendants.[31]

---

[31] Other decisions cited by the government and the dissent, *post* at 57-60, fail to persuade us that we should adopt the government's necessity requirement or the dissent's proposal to categorically carve out from attorney-client privilege arguably threatening statements communicated to counsel. A number of these cases are not on point because, for instance, they address whether an attorney-client relationship even exists; apply the crime-fraud exception that has not been invoked in this case; or analyze waiver of the privilege, which likewise is not an issue before us. *See, e.g.*, *State v. Hansen*, 862 P.2d 117, 121-22 (Wash. 1993) (en banc) (no attorney-client relationship and secondarily the crime-fraud exception); *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543 (D.C. 1981) (waiver); *Wender v. United Servs. Auto. Ass'n*,

## C.    Application of the Significant Purpose Test to These Facts

The trial court in this case concluded that Mr. Moore's statements to Mr. Harvey in which he threatened the AAG who was prosecuting him for contempt were not protected by the attorney-client privilege because Mr. Moore was not seeking legal advice and because his expressions of anger were not related to obtaining legal advice.   This ruling misunderstands the basic dynamic of the relationship between a criminal defendant and their court-appointed counsel and too narrowly construes statements that "relate[]" to the provision of "legal advice" within that relationship, *In re PDS*, 821 A.2d at 902, in a way that cannot be reconciled with the significant purpose test we describe above.

Mr. Moore first made the remarks about the AAG that so alarmed his court-

434 A.2d 1372 (D.C. 1981) (same).  An overlapping group have no precedential value in their own jurisdictions because they are either unpublished or are trial court rulings.  And those that are actually on point are thinly reasoned and reflect a narrow conception of the privilege that we conclude is inimical to any trusting relationship between court-appointed counsel and a criminal defendant. *See, e.g.*, *Hopkinson v. State*, 632 P.2d 79, 112, 115 (Wyo. 1981) (making a conclusory statement about whether the privilege would apply to threats after citing *Fisher* without analysis in the context of a claim about prejudicial error from a prosecutor's opening statement); *Jackson v. State*, 293 S.W. 539, 540 (Tenn. 1927) (appearing to hold broadly that *any* statement about a "contemplated crime" is not protected by attorney-client privilege).

appointed counsel on April 12, 2018. It was the middle of a trial that had spanned months, and Mr. Moore was standing just outside the courtroom. Like so many people in his position, he was "agitated" and "angry" about his circumstances, in particular the possibility that the AAG prosecuting his case might persuade the court to put him back on a GPS monitor.[32] And like so many individuals facing a loss of liberty, he made a series of "unguarded and ill-advised" remarks, *In re PDS*, 831 A.2d at 901, to the lawyer whose sole job was to represent him, about the AAG who he (not unreasonably) perceived to be his adversary. Having disabused ourselves of the notion that only an indigent client's deliberate, carefully crafted requests for advice on discrete points of law can be said to "relate" to the legal purpose for which the client has been appointed counsel, we look to whether Mr. Moore's significant purpose in speaking to Mr. Harvey was to obtain legal assistance. Undoubtedly, it was. His central concern was the government's effort to alter his conditions of release and how such an alteration might have an adverse impact on his life. And at least at the outset, Mr. Harvey himself recognized that Mr. Moore's comments necessitated his counsel: he tried to explain that the AAG advocating for detaining

---

[32] One also hopes Mr. Harvey was aware of the other stressors contributing to his client's state of mind: Mr. Moore was litigating a divorce and the custody arrangement for his children, was experiencing job instability, and had recently lost a parent. See the discussion of collateral and ancillary issues *supra* Section II.B.3.

or monitoring him was doing her job and that Mr. Moore's anger was counterproductive. Although it was arguably counterproductive to tell Mr. Moore it was "just silly on his part to be angry," the fact that Mr. Harvey was ineffective in counseling his client and failed to help him regain his composure and perspective[33] did not make Mr. Moore's continuing and intensifying expressions of anger, manifesting in his threat to shoot the AAG, unrelated to Mr. Harvey's court appointment.

For privilege purposes, the conversation Mr. Moore had with Mr. Harvey on June 29, 2018, was a repeat of April 12. Late in the afternoon that Friday, the AAG successfully argued for Mr. Moore to be placed on GPS monitoring, and the court informed Mr. Moore that he would have to return to court the following Monday. Following the hearing, Mr. Moore, upset that he might lose his job, went outside to speak with his lawyer and made yet another set of "unguarded and ill-advised" remarks about the AAG. *See In re PDS*, 831 A.2d at 901. These remarks too were within Mr. Moore's significant purpose to obtain legal assistance and protected by attorney-client privilege, notwithstanding the fact that on this occasion Mr. Harvey did not even attempt to counsel Mr. Moore about his concerns and instead

---

[33] Mr. Harvey did not appear to consider this part of his job. See *supra* note 2. Instead, his immediate reaction was to seek to withdraw. See *supra* Section I.A.

immediately went to the judge to renew his motion to withdraw. Applying the privilege to this scenario recognizes that this was a missed opportunity for counseling—whereas not applying privilege would undermine the possibility that court-appointed counsel could or would forge the relationship to make such counseling possible.[34]

Having determined that the privilege applied to Mr. Moore's and Mr. Harvey's hallway conversation on both April 12 and June 29, we also observe that no exception applied to take Mr. Moore's statements outside of the privilege. In particular, the crime-fraud exception to the attorney-client privilege did not apply and the government has never argued otherwise. As noted above, "[i]t is fundamental that th[is] exception applies only to communications made to further ongoing or future crimes."[35] *In re PDS*, 831 A.2d at 906 (citations omitted).

---

[34] It seems beyond dispute that the best outcome for the "observance of law and the administration of justice," *In re PDS*, 831 A.2d at 900, would have been for Mr. Harvey to convince Mr. Moore that harming the AAG would not serve his interests—not to tell Mr. Moore to "keep [his plans to shoot the AAG] to [him]self."

[35] The government appears to argue in a footnote in its brief that, because Mr. Moore's threats crime was "completed" upon uttering his statements to Mr. Harvey, these statements fall outside the privilege. The government cites no supporting authority for this proposition. Moreover, as explained above, *supra* Section II.B.1, the attorney-client privilege squarely applies to a client's statements about completed crimes. Thus it is unclear why the fact that a statement itself arguably

Nothing in the record suggests that Mr. Moore "use[d] [Mr. Harvey's] advice or services to pursue a crime or fraud, or [that] the attorney-client communication itself materially advance[d] a crime or fraud." *Id.* at 902.[36]

The dissent argues that "[t]here still is no reason to hold that Mr. Harvey's testimony about the second set of threats Mr. Moore uttered against the AAG . . . was inadmissible" because by this point "[a]ny trust that Mr. Moore might have had earlier that his relationship with Mr. Harvey was entirely confidential (such that nothing he said to Mr. Harvey could ever result in prejudice) was removed once Mr. Harvey" "caution[ed]" Mr. Moore that he would "believe" Mr. Moore if he "ever use[d] this kind of language" again. *Post* at 69-70; *see also id.* at 62 n.4. Such a "caution" is hardly the equivalent of a warning that if Mr. Moore made similar statements, Mr. Harvey would feel himself free to testify against Mr. Moore in a

---

constitutes a completed crime as soon as it is uttered would put it outside the privilege.

[36] In a confusing discussion of *In re PDS*, the government points out our holding that the false witness statements in that case were unprotected by attorney-client privilege. The government is correct that, in addition to holding that the client's communications with counsel about prior criminal activity *were* privileged, we held that any witness statements constituting evidence of the charged crime of obstruction, which had been given to counsel, were *not*. 831 A.2d at 910-11. But this second holding concerning statements by third parties bears no resemblance to Mr. Moore's statements to counsel here, and as a result that part of the analysis is irrelevant.

criminal case. But even if Mr. Harvey had given such an express warning, he had no authority to limit the scope of the privilege, as the privilege belongs to and may only be waived by the client. *See* 8 *Wigmore on Evidence* § 2321, at 629.

## D. Assessment of Harm

Having concluded that the trial court erred in ruling that the attorney-client privilege did not apply to Mr. Moore's statements to Mr. Harvey, and that Mr. Harney's testimony about those statements should not have been admitted at trial, we consider whether reversal is required. As Mr. Moore does not allege any constitutional error, we apply the harmless error standard set forth by the Supreme Court in *Kotteakos v. United States,* 328 U.S. 750, 764-65 (1946), and ask whether we can say "with fair assurance, after pondering all that happened, without stripping away the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Andrews v. United States*, 922 A.2d 449, 458 (D.C. 2007) (quoting *Kotteakos*, 328 U.S. at 765). There is only one way to answer this question. Mr. Harvey was the only witness who actually heard Mr. Moore's statements, and those alleged statements formed the entire basis of the government's charges. Without Mr. Harvey's testimony, no jury could have found Mr. Moore guilty of any of the charged conduct.

### III.    Conclusion

Mr. Moore makes additional arguments on appeal challenging the court's instructions to the jury and arguing that the court erred by not allowing him to "meet with his attorney after the close of the government's case to make a final decision whether to testify." Because we hold that it was error for the court to admit Mr. Harvey's testimony about his conversations with Mr. Moore, and it appears highly unlikely that either the jury instructions or Mr. Moore's decision about whether to testify would reflect the same considerations in the event of a retrial, we do not address these claims. *See Beard v. United States*, 535 A.2d 1373, 1377 n.4 (D.C. 1988).

For the above reasons, we reverse the trial court's evidentiary determination and vacate Mr. Moore's conviction.

*So ordered*.

THOMPSON, *Senior Judge*, dissenting in part: I agree with my colleagues that the evidence was legally sufficient to support Mr. Moore's convictions of threatening a public official and obstructing justice. However, I cannot agree with

my colleagues' quite disturbing conclusion that the testimony on which his convictions rest was inadmissible because protected by the attorney-client privilege.

This court's case law endorses the classic articulation of the attorney-client privilege:

> (1) [W]here legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at [the client's] instance permanently protected (7) from disclosure by [the client] or by the legal adviser, (8) except the protection be waived.

*Jones v. United States*, 828 A.2d 169, 175 (D.C. 2003) (quoting 8 John Henry Wigmore, *Evidence in Trials at Common Law* § 2292 (John T. McNaughton rev. 1961)). "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The privilege "rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Id.* (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)); *see also In re Pub. Def. Serv.*, 831 A.2d 890, 900 (D.C. 2003) ("Lawyers cannot give

sound legal advice without being apprised of all pertinent facts, no matter how embarrassing or inculpating these facts may be." (internal quotation marks omitted)).

The foregoing should suffice to show why the Superior Court did not err in ruling that the threats Mr. Moore uttered to his counsel Mr. Harvey — the bases for his convictions of obstruction of justice and threats in the instant case — were not covered by the attorney-client privilege. Referring to the Assistant Attorney General ("AAG") who was prosecuting him for contempt for violation of a civil protection order ("CPO"), Mr. Moore told his counsel on April 12, 2018, "I'll shoot that bitch." On June 29, 2018, referring again to the AAG, Mr. Moore repeatedly told his counsel, "If I lose my job, I'm going to bust a cap in this bitch [making a hand gesture simulating a gun]." As Mr. Moore was the party asserting the attorney-client privilege to prevent Mr. Harvey from testifying to the threats uttered by Mr. Moore, Mr. Moore had the burden of showing that the privilege applied. *See Jones*, 828 A.2d at 175. That is, Mr. Moore had the burden of establishing that "the statements at issue were made for the purpose of facilitating the rendering of legal services to the client." *United States v. Ivers*, 967 F.3d 709, 715 (8th Cir. 2020) (internal quotation marks omitted).

Mr. Moore did not meet that burden in advancing his motion in limine to preclude Mr. Harvey from testifying to the threats, and he has not met that burden in his briefs in this appeal. He does not claim that he was seeking his counsel's advice when he made the threats (indeed he denies that he made the statements), and nothing in the record indicates that any of his utterances of the threatening statements related in any way to the purpose of seeking legal advice from Mr. Harvey. Mr. Moore did not merely make an "unguarded and ill-advised suggestion[] to [his] lawyer[]" for the lawyer to evaluate and veto. *In re Pub. Def. Serv.*, 831 A.2d at 901. Nor did any of the threats impart information that Mr. Harvey needed to know to advise or advocate for Mr. Moore in his contempt case. To the extent that Mr. Harvey needed to understand how profoundly upset and "frustrated" Mr. Moore was that the AAG had urged the CPO court to require Mr. Moore to resume wearing a GPS ankle device (which triggered Mr. Moore's anger and threats to shoot the AAG), Mr. Moore had already conveyed his anger when he said to Mr. Harvey, "Fuck that bitch."[1] No one disputes that the threats were tangentially related to Mr. Moore's legal matter (in that Mr. Moore presumably would not have threatened the prosecutor had she not been prosecuting him), but neither Mr. Moore nor my

---

[1] That outburst caused Mr. Harvey to explain to Mr. Moore that the AAG was only doing her job and to assure Mr. Moore that it was his (Mr. Harvey's) job to "ask the judge to remove" the ankle device.

colleagues in the majority have identified any plausible way in which the threats were related to the purpose for which Mr. Moore sought legal advice or for the purpose of facilitating the rendering of legal services.

The motions judge analyzed the context correctly:

> [T]he nature of the communication in question, here threatening the prosecutor and stating repeatedly what he's going to do, is not related to the legal advice about how to proceed at trial. It's not related to trial strategy. It's not related to defenses. It is not related to cross examination of witnesses. It's not related to anything except the desire to kill the prosecutor and that is not a legal purpose in the sense of seeking legal advice and, therefore, it is not a privileged communication.

Moreover, as the motions judge recognized, it is doubtful at best that the second set of threats was made in confidence; according to Mr. Harvey's grand jury testimony, after the first incident, Mr. Harvey warned Mr. Moore that if Mr. Moore ever threatened the AAG again, Mr. Harvey would tell the court what he said.[2]  Further,

---

[2] *See, e.g.*, *Diversified Grp., Inc. v. Daugerdas*, 139 F. Supp. 2d 445, 457 (S.D.N.Y. 2001) ("[T]he [attorney-client] privilege is limited to those communications which were either expressly made confidential, or which the client could reasonably believe under the circumstances would be understood by the attorney as such.").  This is not to dispute that the attorney-client privilege belongs to the client, not the attorney, see *ante*, at 49, but only to say that a communication that was not made in confidence does not fall within the scope of the privilege.

protecting Mr. Moore's threats from disclosure as trial evidence does not serve the purpose of the attorney-client privilege to "promote broader public interests in the observance of law and administration of justice." *Wender v. United Servs. Auto. Ass'n*, 434 A.2d 1372, 1373 (D.C. 1981). To the contrary, a holding that permits an accused to prevent adverse testimony by his prior counsel about a threat uttered in counsel's presence works against "the need for probative evidence in the administration of criminal justice." *Trammel*, 445 U.S. at 51.[3]

---

[3] My colleagues repeat the assumption, long reflected in case law, that the attorney-client privilege encourages criminal defendants to speak candidly with their attorneys. *Ante*, at 23-27. But commentators have found that "empirical evidence does not support the assumption that clients rely on a guarantee of absolute confidentiality when they decide whether to be candid with their lawyers"; that "little or no evidence exists to substantiate the presumption that clients would not confide in lawyers without the guarantee of absolute confidentiality"; and that "[v]ery few studies have investigated what clients actually know about confidentiality exceptions and the effect this knowledge has on representation." Elisia M. Klinka & Russell G. Pearce, *Confidentiality Explained: The Dialogue Approach to Discussing Confidentiality with Clients*, 48 SAN DIEGO L. REV. 157, 158, 171 (2011); *see also id.* at 174 (noting survey findings that "an explanation of confidentiality that acknowledged specific exceptions" was "roughly as effective as the pledge of absolute confidentiality" for purposes both of effective representation and gaining necessary information). My colleagues say further that the relationship of trust that the attorney-client privilege is meant to foster and protect is a "critical means of ensuring a meaningful attorney-client relationship." *Ante*, at 31. But commentators have suggested that the key to promoting trusting relationships between indigent defendants and their attorneys lies elsewhere. *See generally* Kenneth P. Troccoli, "*I Want a Black Lawyer to Represent Me*": *Addressing a Black Defendant's Concerns with Being Assigned a White Court-Appointed Lawyer*, 20 LAW & INEQ. 1, 48 (2002) (urging that fostering trusting relationships between indigent defendants and counsel requires giving the defendants a greater role in selecting who will represent them);

I would hold that the attorney-client privilege did not preclude Mr. Harvey from giving testimony before the grand jury and at trial about the threats uttered by Mr. Moore while he was Mr. Harvey's client. Numerous federal and state appellate courts, including the Eighth and Ninth Circuits, have reached analogous conclusions on facts similar to those involved here. *See, e.g.*, *Ivers*, 967 F.3d at 714-16 (defendant's threats to kill a judge, made during conversation with his attorneys pertaining to his civil case, were admissible at trial because "[t]hreats of violence are not statements that fall under the scope of the attorney-client privilege"); *United States v. Alexander*, 287 F.3d 811, 815-17 (9th Cir. 2002) (defendant's statements to his court-appointed attorney threatening violence against the prosecutor in his mail- and wire-fraud case "were clearly not communications in order to obtain legal advice" and thus the attorney did not violate the attorney-client privilege by testifying about the threats before the grand jury and at trial); *United States v. Thomson*, Nos. 94-30083 and 94-30085, 1995 U.S. App. LEXIS 4876, at *3 (9th Cir. Mar. 13, 1995) (no error in denying motion to suppress attorney's testimony about statements Thomson made during a phone call with his attorneys, in which Thomson threatened the judge presiding over his criminal case and the judge's family; the

---

Fred C. Zacharias, *Rethinking Confidentiality*, 74 Iowa L. Rev. 351, 386 (1989) (concluding that survey results "suggest that the general sense of trust in attorneys as professionals — rather than particularly strict confidentiality rules — is what fosters client candor").

court had "absolutely no difficulty concluding" that the statements were not protected by the attorney-client privilege because the statements "clearly were not made for the purpose of obtaining legal advice"); *State v. Hansen*, 862 P.2d 117, 121 (Wash. 1993) (in a phone call with an attorney whom Hansen consulted about representing him in a civil suit, Hansen made the threat "to get a gun and blow . . . away" the judge [in Hansen's felony case], the prosecutor, and the public defender; the court explained that even "[i]f an attorney-client relationship could have been found to exist" at the time the threat was made, "the privilege would still not apply" because "[t]he attorney-client privilege is not applicable to . . . conversations regarding the [client's] contemplation of a future crime"); *Hopkinson v. State*, 632 P.2d 79, 115-16 (Wyo. 1981) (reasoning that it was error to exclude attorney's testimony about a threat uttered by the client, because "[w]e cannot imagine a threat of injury made by a client toward the family and property of an attorney as being privileged and within those communications protected"); *Jackson v. State*, 293 S.W. 539, 540 (Tenn. 1927) (finding no error in admission of attorney's testimony because "threats made by a client against the life of a person during a professional consultation with his attorney are not privileged"; "[i]t would be monstrous to hold . . . that the lips of the attorney would be sealed, when the fact might become important to the ends of justice in the prosecution of crime. . . . We presume the rule has never been extended so far, nor will it be."); *cf. Hodgson Russ, LLP v. Trube*,

867 So. 2d 1246, 1247, 1248 (Fla. Dist. Ct. App. 2004) (where client uttered to his attorney a threat to kill the client's sister/adversary if the case was not resolved in his favor, the threat "was extraneous and was not a communication incident or necessary to obtaining legal advice" and thus was not privileged and could be described in the attorney's interrogatory response in wrongful death action).

Numerous trial courts have similarly allowed attorneys to testify about threats made by their clients over objections that the testimony would violate the attorney-client privilege. *See, e.g.*, *United States v. Stafford*, No. 17-20037, 2017 U.S. Dist. LEXIS 71835, at *2, *6-7 (E.D. Mich., May 11, 2017) (denying defendant's motion to suppress statement he made to his social security disability attorney threatening to "put a bullet in [the] head" of the social security administrative law judge who denied his claim, because the defendant failed to demonstrate that his statements were made in pursuit of legal advice; reasoning that the statements "did not inquire or relate to legal avenues that might be available to [defendant] and his attorney," defendant "was not inquiring about the impact of the ALJ's decision, his appellate rights, or alternative legal remedies available to him"); *United States v Jason*, No. 09-CR-87-LRR, 2010 U.S. Dist. LEXIS 25437, at *4 (N.D. Iowa Mar. 18, 2010) (permitting defendant's former attorney to testify about a threatening letter the defendant sent while the attorney-client relationship was intact, because the

statements in the letter were not made for the purpose of seeking legal advice); *United States v. Sabri*, 973 F. Supp. 134, 140-41 (W.D.N.Y. 1996) (concluding that defendant's statements to his immigration attorney threatening to kill 50 to 100 people to protest delays in his immigration proceedings were not privileged, and would not be suppressed, because the statements were not related to the legal advice sought by defendant from the attorney, or to "advice in connection with the immigration proceedings concerning defendant's alien status and/or his ability to leave the country to visit his dying father," and were not shown to be "relevant or material to the issues involving the defendant's immigration status"); *see also D'Amario v. United States*, 403 F. Supp. 2d 361, 373 (D.N.J. 2005) (recounting that attorney, who had represented D'Amario in a felon-in-possession case, was permitted to testify at D'Amario's trial on charges of threatening a federal judge, about a letter that D'Amario had sent the attorney, in which he threatened to shoot the judge involved in his earlier case). These cases, from across the country, are not precedential, but, like the appellate decisions cited above, they demonstrate just how far from the mainstream my colleagues are in their interpretation of the attorney-client privilege as it applies to communications by indigent criminal defendants. These cases also show that the Eighth and Ninth Circuit rulings cited above are not outliers.

As support for their novel interpretation under which the attorney-client privilege protects *any* communication that an indigent criminal defendant makes to their attorney (save those that fall under the so-called crime-fraud exception), my colleagues in the majority cite *State v. Boatwright*, 401 P.3d 657 (Kan. App. 2017). *Ante*, at 35. In *Boatwright*, the Kansas Supreme Court held that the defendant's threat to kill his former fiancée, uttered to the defendant's attorney, was privileged and thus not admissible into evidence. The court remarked that a different conclusion would "call[] for the piecemealing of attorney-client communications and would fundamentally undermine the attorney-client relationship." *Id.* at 664. Notably, however, the Kansas court was applying a Kansas statute, Kan. Stat. Ann. § 60-426(a) (Supp. 2016), under which the attorney-client privilege applies to "communications made in the course of [a] relationship" in which legal advice is sought from a professional legal advisor in his or her capacity as such. *See id.* That articulation of the privilege does not comport with the law in our jurisdiction, as described in *Jones* and other cases, or with the Wigmore formulation. Our case law requires that to be protected by the attorney-client privilege, a communication must "relat[e] to th[e] purpose" of seeking legal advice. *Jones*, 828 A.2d at 175. Thus, *Boatwright* does not support the court's holding in this case.

My colleagues in the majority also cite *Purcell v. District Attorney for the Suffolk District*, 676 N.E.2d 436 (Mass. 1997), as support for the expansive attorney-client privilege they have created. In *Purcell*, the Massachusetts Supreme Judicial Court considered a scenario in which the client told his attorney about "his intention to commit arson." *Id.* at 441. The court instructed that the attorney would not be permitted to testify about the conversation. The court reasoned that "[u]nless the crime-fraud exception applies [as it does where a client informs their attorney of the client's intention to commit a crime, for the purpose of receiving legal advice or assistance in furtherance of criminal conduct], the attorney-client privilege should apply to communications concerning possible future, as well as past, criminal conduct[.]" *Id.* at 441.[4] The court explained that this is because "an informed lawyer

---

[4] *But see Nix v. Whiteside*, 475 U.S. 157, 174 (1986) ("A defendant who informed his counsel that he was arranging to bribe or threaten witnesses or members of the jury would have no 'right' to insist on counsel's . . . silence. . . . An attorney's duty of confidentiality, which totally covers the client's admission of guilt, does not extend to a client's announced plans to engage in future criminal conduct.").

By citing *Nix* and other materials pertaining to ethical rules, I am not confusing the ethical rules regarding disclosure of confidences and the attorney-client privilege; rather, I show that communications about a plan to engage in a future crime are not confidential, and thus cannot be said to have been made in confidence (i.e., with a legitimate expectation of confidentiality) and to fall within the scope of attorney-client privilege. *See Cobell v. Norton,* 377 F. Supp. 2d 4, 11 (D.D.C. 2005) ("[A]ny expectation of secrecy must be reasonable in order to support a claim of privilege." (citing *United States v. Robinson*, 121 F.3d 971, 976 (5th Cir. 1997) ("The assertor of the [attorney-client] privilege must have [had] a reasonable expectation of confidentiality[.]"))). The statement in *Purcell* that "[t]he fact that

may be able to dissuade the client from improper future conduct[.]" *Purcell* does not support the result the court has reached in the instant case, where, as we have noted, Mr. Moore did not merely suggest or describe an ill-advised course of action for the attorney to evaluate. *Cf. In re Pub. Def. Serv.*, 831 A.2d at 901. He did not merely share with his counsel "uncensored thoughts and feelings about [his] case." *Ante*, note 24. Rather, and as the government argues, he uttered a completed threat against the AAG, thereby committing a crime in Mr. Harvey's presence. *Newman v. State*, 863 A.2d 321 (Md. 2004), is distinguishable on the same basis, as it involved testimony, by the attorney who represented the client in a divorce and custody case, not about completed threats as we are concerned with here, but about a conspiratorial discussion, between the client and a friend during a meeting with the attorney, about a plan to kill the client's child or children and cast blame on the client's husband so that he would be jailed.[5] *Id.* at 324.

---

the disciplinary code permitted [the attorney in] Purcell to make the disclosure tells us nothing about the admissibility of the information that Purcell disclosed" (which cites as authority a Florida appellate case that relied on the Florida Evidence Code), 676 N.E.2d at 438, is unpersuasive.

[5] The attorney's testimony "established the possible conspiracy [to commit first-degree murder]" of which the jury eventually convicted the client. 863 A.2d at 327, 337. The *Newman* court's analysis focused on whether the crime-fraud exception applied and the significance of the fact that the client's statements were made in the presence of the friend, but did not analyze whether the communication was related to the purpose of seeking legal advice. *Id.* at 333-37.

Mr. Moore argues that there is no meaningful difference between the threats uttered by Mr. Moore and the plans discussed in *Purcell* and *Newman*, but we should be guided by the Supreme Court's reasoning in *Trammel* and reject that argument. In *Trammel*, the Supreme Court reasoned that when the testimony at issue is about a crime that was witnessed by a party to a confidential relationship (there, marriage), rather than about a mere communication between the parties to that confidential relationship, a holding that the witness is precluded from testifying about the crime would work against "the need for probative evidence in the administration of criminal justice." *Trammel*, 445 U.S. at 51 (holding that unlike the marital communications privilege, which protects information privately disclosed between husband and wife in the confidence of the marital relationship, the spousal testimonial privilege may be asserted by the witness-spouse only). Just as the Supreme Court did in *Trammel* in holding that the witness spouse could elect to testify about her husband's crime, we should hold that the trial court did not err in permitting Mr. Harvey to testify about the threats made by his client Mr. Moore, to which Mr. Harvey was an ear-witness.

My colleagues in the majority do not seriously claim that Mr. Moore's threats fall within the bounds of the attorney-client privilege as this court's case law has conceived it. Instead, they conclude that the privilege "logically applies more

expansively in the [indigent criminal defense] context." *Ante*, at 22. That more expansive application entails "a strong presumption that, any time [an indigent criminal defendant] speaks to their court-appointed lawyer, a significant purpose of that communication is to receive legal advice in the case for which the lawyer has been appointed to represent them," *ante*, at 36, as if indigent criminal defendants do not have the same range of motives for what they say in conversation as other people may have. [6] Yet privileges, as "exceptions to the demand for every man's evidence[,]

---

[6] The rationale for development of the "significant purpose" test that my colleagues attempt to apply is avoidance of the difficulty of determining, in a business context, which, among multiple motives, constituted the one primary or one predominant purpose of a client's allegedly privileged communication to its lawyer. *See FTC v. Boehringer Ingelheim Pharms., Inc.*, 892 F.3d 1264, 1267 (D.C. Cir. 2018) (recognizing that "[t]he application of the attorney-client privilege can become more complicated when a communication has multiple purposes — in particular, a legal purpose and a business purpose" (citing 1 Restatement (Third) of the Law Governing Lawyers § 72, Reporter's Note, at 554 (2000))); *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014) ("It is . . . not correct for a court to try to find *the* one primary purpose in cases where a given communication plainly has multiple purposes. Rather, it is clearer, more precise, and more predictable to articulate the test as follows: Was obtaining or providing legal advice *a* primary purpose of the communication, meaning one of the significant purposes of the communication?"). As the foregoing citations reflect, determining whether attorney-client privilege applies requires a "communication-by-communication analysis," and it is "the nature of the particular attorney-client communication that is dispositive." *United States v. Mett*, 178 F.3d 1058, 1065 (9th Cir. 1999).

My colleagues frame the issue as whether a significant purpose of the relationship between an indigent criminal defendant and his court-appointed counsel is to obtain legal advice, but the correct question is a whether a purpose of the particular communication in issue was to obtain legal advice. Here, there has been

are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710 (1974). Accordingly, privileges are to be "strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Trammel*, 445 U.S. at 50 (internal quotation marks omitted); *see also Jones*, 828 A.2d at 174 (recognizing that the privilege is construed "narrowly to protect only those purposes which it serves"). I am at a loss to discern what public good comes from a ruling that permits a client who has uttered threats like Mr. Moore did to escape prosecution or punishment because (as far as the record reflects) he uttered them only to his court-appointed counsel.[7]

Far from any public good flowing from my colleagues' conclusion, it would seem to follow from the analysis in the majority opinion that indigent criminal

no showing that the threats Mr. Moore uttered had, as even one of multiple purposes, the purpose of obtaining legal advice.

[7] Nor does the record give us any reason to think that a holding that Mr. Moore's threats against the prosecutor were not protected would undermine a large number of attorney-client relationships. Mr. Harvey, who told the court that he had been taking court-appointments to represent defendants in criminal cases for 30 years, further testified that in his experience it was unusual for a client to threaten a prosecutor and that he had never before reported such a threat to the court.

defendants can threaten their lawyers, witnesses, or court officials with impunity as long as they do so in private conversation with appointed counsel. Under the court's holding today, it appears that no evidentiary use could be made of a statement such as the following uttered by the indigent defendant to their court-appointed lawyer: "You are doing a terrible job for me. I know where you and your family live, and I am going to torture and kill you all." Similarly, if a court-appointed defense attorney disclosed to the court that a defendant who was on pre-trial release had repeatedly threatened to kill the complaining witness (as Rule 1.6 of the Rules of Professional Conduct would permit the attorney to do), that information could not be used to revoke the defendant's release. These results would be alarming. My colleagues disclaim an intent to hold categorically that all threats uttered by an indigent criminal defendant to court-appointed counsel are protected by the expansive attorney-client privilege the majority opinion creates, *see ante* at note 30, but the opinion does not explain what facts and context different from those involved in this case would call for a different conclusion.

My colleagues' expansive application of the attorney-client privilege in the context of indigent criminal defendants appears to reflect an assumption that indigent criminal defendants, who as they note often are facing traumatic and life-altering situations, *ante*, at 37-38, generally are unable to abide by the standards that

apply to other members of society, including other criminal defendants. In my view, such an assumption is patronizing and demeaning, because it fails to acknowledge the autonomy and agency of Mr. Moore and indigent criminal defendants more generally.[8] This court has already decided that we may not protect criminal defendants at the price of denying their autonomy. *See Douglas v. United States*, 488 A.2d 121, 144-45 (D.C. 1985) ("A trial court . . . should not interfere with a defendant's choice [to retain his counsel who is burdened by a conflict of interest known to the client] solely for the purpose of protecting the defendant's right to effective assistance of counsel" "even when disqualification would further the court's perception of the defendant's best interest," because "[a] contrary holding would be patronizing toward defendants and would rob them of their right to choose freely how to present themselves before the law."). The same rule should apply here. We should accord indigent criminal defendants "the dignity associated with

---

[8] And beyond that, the court's analysis proves too much. The court cites the array of collateral and ancillary issues that plague indigent criminal defendants, such as adverse immigration consequences, loss of parental rights, loss of housing, seizure of property, loss of employment, and other disruptions to personal and family life. *Ante*, at 38. To the list the court might add, in the case of black and brown defendants, the systemic racism and race-related micro-aggressions that continue to take their tolls. There can be no doubt that real-life problems of these kinds burden many criminal defendants, to the discredit of all of us. But if these problems justify expanding the attorney-client privilege to protect indigent criminal defendants from convictions based on threats they utter in the presence of their counsel, why do these problems not also protect these defendants from prosecution and punishment based on other crimes that are similarly traceable to the defendants' difficult life circumstances?

recognition as . . . whole human being[s]," *Trammel*, 445 U.S. at 52, who are more than their poverty and accused status; who often are sophisticated and smart; and who, we should presume, are capable of conforming their conduct to the law in the context of an attorney-client relationship. We do not accord them the respect and dignity they are due as human beings when we hold — as the court effectively does today — that it is too much to ask of them that they refrain from uttering threats when communicating with counsel, and when we dictate that they may not be held accountable if that requires permitting counsel to give evidence about the threats.[9]

All that said, let us assume arguendo that the expansive attorney-client privilege the court now affords to indigent criminal defendants is necessary to foster a relationship of trust between the client and his court-appointed attorney and to encourage full and frank communications between the two (a rationale that I will refer to as the "safe-space rationale"). There still is no reason to hold that Mr. Harvey's testimony about the second set of threats Mr. Moore uttered against the

---

[9] I appreciate that the court's ruling is intended to afford expansive protection to indigent criminal defendants. But as another court once put it, "No doubt there are occasions when benefits are conferred by those who patronize, but the benefits conferred are at the expense of . . . dignity . . . . Personal dignity is not honored but diminished when the capacity to commit one's self is implicitly denied." *United States v. Martinez*, 883 F.2d 750, 761 (9th Cir. 1989).

AAG, on June 29, 2018, was inadmissible. Any trust that Mr. Moore might have had earlier that his relationship with Mr. Harvey was entirely confidential (such that nothing he said to Mr. Harvey could ever result in prejudice) was removed once Mr. Harvey gave Mr. Moore the following caution on April 12, 2018:

> You will never, ever use this kind of language with me about anybody because, from this point forward, I'm going to believe you. So if you decide you want to go shoot somebody, you need to keep that to yourself and don't make me a part of it. . . . [I]f you can agree to those terms, I can continue to represent you in this case[.]

That warning let Mr. Moore know that, by uttering additional threats on June 29, he could well be prejudiced by his counsel's resultant withdrawal from representing him.[10] Accordingly, the safe-space rationale cannot justify the court's conclusion that the attorney-client privilege protected the second set of threats Mr. Moore uttered on June 29, 2018.

---

[10] Mr. Harvey testified that by April 12, his relationship with Mr. Moore "had reached a point where he and I could no longer have dialogue."